Robert CATALDO, Interim Trustee of Table Talk, Inc., Debtor being Liquidated Pursuant to Chapter 7 of the Bankruptcy Code

v.

Moshe I. MEIDAR, et al.

Civ. A. No. 84–5407.

United States District Court,
E.D. Pennsylvania.

Aug. 3, 1988.

Charles W. Morse, Jr., Boston, Mass., Spencer Ervin, Jr., Philadelphia, Pa., for plaintiff.

Franklin Poul, Philadelphia, Pa., for Meidar, Prime Asset Management, Inc., New Pie, Inc.

Alan J. Hoffman, Philadelphia, Pa., for Joseph Liss.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FULLAM, Chief Judge.

1. Plaintiff is Robert Cataldo, Interim Trustee of Table Talk, Inc., a debtor being liquidated pursuant to Chapter 7 of the Bankruptcy Code, in the Bankruptcy Court for the District of Massachusetts (case No. 82–00253–G).

2. The defendant New Pie, Inc. is an Ohio corporation formed in 1982 for the purpose of purchasing all of the issued and outstanding stock of Table Talk, Inc. from its then-owner, Texas General. New Pie now owns all of the issued and outstanding stock of Table Talk and has no other assets.

3. The defendant Moshe I. Meidar is the sole shareholder of defendant New Pie, Inc. He is also the sole shareholder of the defendant Prime Asset Management, Inc.,

a management firm based in Ohio, which firm Meidar has operated for many years.

4. Table Talk, Inc. is a Massachusetts-based firm which, among other things, manufactured and distributed fresh pies.

5. Joseph Liss, Jon Liss and Jerry Drew (collectively referred to as the "Liss Group") operate a bakery business in the Philadelphia area, and have done so for many years. In certain parts of Northeastern United States, Table Talk and the Liss Group were in actual or potential competition with each other.

6. In the latter part of 1983, it became known in the trade that Kellogg wished to dispose of its Pennsylvania-based fresh-pie division, Mrs. Smith's Pies. Mr. Meidar and the principal creditors of Table Talk (Squibb and the Creditors Committee) believed that acquisition of Mrs. Smith's Pies would be advantageous to Table Talk, which had been undergoing a Chapter 11 reorganization under the bankruptcy laws since 1982. Acquisition of Mrs. Smith's Pies also seemed attractive to the Liss Group. The Liss group was better situated to finance the purchase, but would have been hard-pressed to assume total management responsibility for the greatly enlarged operations which would ensue.

7. Negotiations among the interested parties resulted in a transaction structured as follows:

a. A new firm, M.L. Desserts, Inc., was formed to purchase the assets of Mrs. Smith's Pies. Meidar owned 50% of M.L. Desserts and was to become its chief executive officer. The Liss Group owned the remaining 50% of M.L. Desserts.

b. The purchase of Mrs. Smith's Pies by M.L. Desserts was financed by an investment of $2 million from the Liss Group, subordinated to a $5 million bank loan from Security Pacific.

c. M.L. Desserts was to be managed by Table Talk for a fee of $21,000 per week.

d. Table Talk licensed M.L. Desserts to use the Table Talk tradename, in exchange for a fee of $2,000 per month.

e. Meidar had the right to name three of the five directors of M.L. Desserts.

Written employment contracts were entered into between M.L. Dessert and Meidar, Jon Liss and Jerry Drew.

f. M.L. Dessert agreed to purchase a substantial portion of its pie shells and filling materials from the bakeries operated by the Liss Group.

g. Upon Table Talk's contemplated emergence from Chapter 11 reorganization proceedings, and assuming it had then achieved a specified net worth, M.L. Desserts would be merged into Table Talk, upon specified terms.

8. Meidar did not invest any of his own money in this or any other relevant transaction. His firm, New Pie, had acquired the outstanding stock of Table Talk on credit, without any cash payment. He did, however, perform services for Table Talk, in a managerial capacity. Similarly, he made no cash investment in M.L. Desserts.

9. The Liss Group were not willing to invest in Table Talk, or to permit Table Talk to have any ownership interest in M.L. Desserts or the assets of Mrs. Smith's Pies, so long as Table Talk was in bankruptcy. Neither Security Pacific nor any other lending institution was willing to finance the transaction except on the basis that Table Talk would not be involved while still in reorganization.

10. The contemplated interim operation of what had formerly been Mrs. Smith's Pies (interim, that is, because it was believed that the substantial improvement in Table Talk's cash flow would enable Table Talk to emerge from bankruptcy on a sound basis, whereupon M.L. Desserts would be merged into Table Talk) did not work out well. Mr. Meidar and the principals of the Liss Group were all strong personalities, rather than team-players; and neither side fully trusted the other. In retrospect, it is not surprising that this mutual distrust should have arisen. Mr. Meidar could well view the Liss Group as primarily interested in promoting the welfare of their bakery firms, and with being unduly concerned with the security of their $2 million investment—and Table Talk's revitalization and the ultimate merger were

not indispensable to the protection of those interests. Conversely, from the perspective of the Liss Group, Mr. Meidar could well be viewed as more interested in management fees and generally milking the operation for his own or Table Talk's benefit, than in achieving the mutual long-range goals stated in the agreement.

11. Soon after M.L. Desserts began operation, litigation erupted between the Liss Group and Mr. Meidar (C.A. No. 84–1273 in this court). The Liss Group succeeded in obtaining an injunction against certain proposed transfers of assets and operations to Table Talk's New England production facility, and against other proposed violations of the agreement between the parties. Eventually, that litigation was settled: the Liss Group purchased Meidar's 50% interest in M.L. Dessert for $225,000.

12. In the meantime, Table Talk's Chapter 11 reorganization proceeding was converted into a Chapter 7 liquidation proceeding, and plaintiff Robert Cataldo was appointed interim trustee on or about August 10, 1984. Plaintiff thereupon filed this action. Among other things, plaintiff asserted that the M.L. Desserts transaction represented a corporate opportunity of Table Talk, and not Mr. Meidar in his individual capacity; plaintiff sought an injunction to prevent the Liss group from paying the $200,000 balance of the settlement with Meidar to anyone but the plaintiff. By agreement of the parties, the Liss Group has deposited the $200,000 in the registry of this court, has withdrawn its counterclaims, and has been dismissed from the action. All that remains, therefore, are the reciprocal claims of plaintiff, and Meidar and his various corporations (New Pie and Prime Asset Management).

## DISCUSSION

Plaintiff seeks to recover from Meidar and his management companies all sums previously paid to any of them by Table Talk, on the theory that such payments were never properly authorized by the Bankruptcy Court. In addition, on the theory that Meidar had fiduciary duties toward Table Talk and should therefore have preserved for Table Talk the corporate opportunities represented by the Mrs. Smith's–M.L. Desserts transactions, plaintiff seeks to recover the $200,000 escrowed balance of the sale price of Meidar's M.L. Desserts stock, plus approximately $86,684 previously paid Meidar by or on behalf of M.L. Desserts. In addition to disputing plaintiff's right to recover any of these sums, Meidar has counterclaimed for unpaid compensation allegedly due and owing by Table Talk to Meidar.

Sorting out the appropriate relationships among the parties, applying the correct legal principles and arriving at the right result is exceedingly difficult in this case. The parties seem to have acted with regrettable informality and lack of precise communication, and seem to have assumed that because their motives were pure, shortcuts could be taken.

I start with the proposition that the controlling shareholder interest in Table Talk was originally held by members of a family named Karol, from Texas. After Table Talk entered reorganization, its principal creditors were dissatisfied with the way in which the Karols were running the company. Meidar and his then-partner, Newlon, arranged to purchase the Karols' stock interest (basically, for $500,000 which would never have to be paid unless Table Talk emerged from reorganization and achieved certain financial goals). At that time, there was an express agreement that the salaries of top management would not be permitted to exceed $100,000 per annum in the aggregate.

Thereafter, management of the company devolved upon Newlon, who was paid a salary, and another hired executive; their total compensation was kept within the $100,000 limit. Meidar was not an officer or employee of Table Talk, and received no compensation. He did, however, make frequent trips to Table Talk's Worcester, Massachusetts offices from his home base in Columbus, Ohio, and was reimbursed his travel expense.

The paid executive resigned. Mr. Newlon and Mr. Meidar had a falling out, resulting in Newlon's resignation and the

sale of his interest to Meidar for a modest sum of money. Thereafter, Meidar became particularly active in trying to keep the venture afloat, and in attempting to arrange financing for the acquisition of Mrs. Smith's Pies.

Mr. Meidar claims that all concerned—Squibb (the principal secured creditor of Table Talk), the Unsecured Creditors Committee, their respective counsel, and the Bankruptcy Court—fully understood that he was providing managerial services for Table Talk and was entitled to receive compensation at the rate of $100,000 per year. Because of Table Talk's cash flow problems, however, he only drew his expenses plus a small amount toward his salary—payments which were, for the most part, channeled through his private management company, Prime Asset Management.

Plaintiff has calculated that Meidar received a total of $86,684 in payments and reimbursements. Plaintiff in this action seeks to recover that sum from Mr. Meidar (or New Pie or Prime Asset Management) on the theory that payments were not authorized by the Bankruptcy Court in Massachusetts, and/or that these payments should be regarded as constructive dividends traceable to Mr. Meidar's 50% ownership of M.L. Desserts, which 50% ownership should be treated as really belonging to Table Talk, because it represented a corporate opportunity which Mr. Meidar improperly appropriated to himself. Plaintiff makes the further, consistent, argument that the $225,000 which the Liss Group agreed to pay for Meidar's 50% ownership of M.L. Desserts ($25,000 has been paid to Mr. Meidar, and the $200,000 balance has been deposited in the registry of this court) should be regarded as an asset of the estate, and should be paid to the plaintiff.

Defendants, on the other hand, argue that Mr. Meidar is entitled to the escrowed $200,000, and that Table Talk has not adequately compensated him for his services. Mr. Meidar makes no claim for affirmative relief for additional compensation, however (apparently, he filed no proof of claim in the bankruptcy proceeding); defendants seek only to use the alleged unpaid compensation as a setoff against any claims successfully pursued by plaintiff.

■ I have concluded that plaintiff's attempt to recover the sums previously paid to Mr. Meidar cannot succeed. Viewed as a whole, the evidence makes it reasonably clear that all concerned in the bankruptcy proceeding were aware of, and approved, the compensation and expense-reimbursement which actually occurred. And I am not persuaded that Mr. Meidar's were the kinds of professional services requiring court approval under 11 U.S.C. § 327.

■ But the plaintiff is, in my view, plainly entitled to the escrowed sum—$200,000 plus interest—representing the balance of the purchase price for Meidar's 50% interest in M.L. Desserts. Mr. Meidar's "ownership" of that interest must be regarded as having been acquired on behalf of Table Talk. The possibility of an eventual advantageous merger between Mrs. Smith's Pies and Table Talk represented a corporate opportunity of Table Talk. The establishment of M.L. Desserts as an interim "bridge" entity was a necessary step in the long-range program. But as the sole shareholder in Table Talk's parent company, and as de facto chief executive officer of Table Talk—then a debtor in possession in a Chapter 11 reorganization—Mr. Meidar was burdened with numerous fiduciary relationships which, alone and in combination, made it legally impermissible for him to siphon off any aspect of that corporate opportunity. Mr. Meidar learned of the availability of Mrs. Smith's Pies through Table Talk personnel, and what little money went into the establishment of M.L. Desserts came from Table Talk, not Mr. Meidar. In short, there is simply no legitimate basis for Mr. Meidar to claim that he, in his individual capacity, now has or ever did have any ownership interest in M.L. Desserts, or in the proceeds from its aborted relationship with the Liss Group.

■ Finally, I reject the argument that Mr. Meidar's claim for unpaid compensation should be set off against plaintiff's claims. On that issue, the defendants have the burden of proof, and have not met it.

The evidence is altogether too nebulous and uncertain to establish any such entitlement to further compensation, particularly in the bankruptcy context.

An Order will therefore be entered, directing the clerk to pay over to the plaintiff the fund now being held in escrow. All other claims will be dismissed.